IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JAMES B. MORRIS,

        Plaintiff,

                                    CV 3:09-CV-620-PK

                                    OPINION AND

v.                                 ORDER

MICHAEL C. ZUSMAN, SUSSMAN
SHANK LLP, NENA COOK, JEFF D.
BRECHT, GRENLEY, ROTENBURG,
EVANS, BRAGG & BODIE, P.C., and
GARY I. GRENLEY,

        Defendants.

PAPAK, Magistrate Judge:

      Plaintiff James B. Morris filed this legal malpractice action against his former attorneys,

defendants Evans & Zusman, PC ("Evans & Zusman"), Michael C. Zusman ("Zusman," and,

collectively with Evans & Zusman, the "Evans & Zusman defendants"), Sussman Shank LP

("Sussman Shank"), Nena Cook ("Cook"), Jeff D. Brecht ("Brecht" and, collectively with

Sussman Shank and Cook, the "Sussman Shank defendants"), Grenley, Rotenberg, Evans, Bragg

& Bodie, P.C. ("Grenley Rotenberg"), and Gary I. Grenley ("Grenley" and, collectively with

Grenley Rotenberg, the "Grenley Rotenberg defendants"), on June 4, 2009. Morris was the

Page 1 - OPINION AND ORDER

founder and CEO of Simutech Corporation ("Simutech"). In 1999, Simutech introduced an integrated circuit prototyping system it called "RAVE." Shortly thereafter, in November 1999, Simutech and Cadence Design Systems, Inc. ("Cadence"), entered into an agreement (the "Simutech/Cadence agreement") pursuant to which Simutech licensed Cadence to resell RAVE systems manufactured by Simutech for that purpose. Simutech began experiencing financial problems in 2001, and on June 30, 2001, the Simutech/Cadence agreement was terminated by the parties thereto. According to Morris, the financial difficulties Simutech experienced at that time were caused by Cadence's misappropriation of Simutech's trade secrets and breach of the Simutech/Cadence agreement.

When Simutech began experiencing financial problems in 2001, it went to one of its original investors, Kirnaf Ltd., for a bridge loan. Kirnaf provided bridge financing secured by all of Simutech's assets. In the fall of 2001, Simutech defaulted on its repayment obligations, and Kirnaf foreclosed on its lien. Kirnaf purchased all of Simutech's assets at public auction in September 2001. On November 13, 2001 Kirnaf contributed the Simutech assets and $750,000 to form a new company, RaveSim, Inc. ("RaveSim").

Morris' claims against his former attorneys arise out of their alleged negligence in representing Morris in connection with claims of misappropriation of trade secrets and breach of contract that Simutech may have had against Cadence. This court has jurisdiction over Morris' action pursuant to 28 U.S.C. § 1332(a), based on the complete diversity of the parties and the amount in controversy.

On July 26, 2011, based on the parties' stipulations, the court dismissed Evans & Zusman as a defendant in this action. On July 28, 2011, the court granted partial summary judgment in

favor of Zusman and the Sussman Shank defendants as to some but not all of Morris' grounds for seeking money damages against those defendants, as discussed in greater detail below.

Now before the court are Morris' motion (#102) for partial summary judgment as to the narrow issue of the enforceability of a provision of the Simutech/Cadence agreement purporting to bar assignment of Simutech's rights under the agreement, and defendants' motion (#103) for partial summary judgment as to the enforceability and applicability of a provision of the Simutech/Cadence agreement purporting to impose a cap on the money damages available in any cause or causes of action asserted by either party to the agreement against the other in connection with the agreement. In addition, at oral argument on the foregoing motions, counsel for Zusman moved orally to strike the third section of Morris' sur-reply in opposition to defendants' motion for partial summary judgment, and counsel for Morris formally requested certification of issues raised by defendants' motion to the California Supreme Court. I have considered the motions, oral argument on behalf of the parties, and all of the pleadings and papers on file. For the reasons set forth below, Morris' motion for partial summary judgment is denied, Zusman's informal motion to strike is denied, Morris' request for certification to California Supreme Court is denied as moot, and defendants' motion for partial summary judgment is granted.

## LEGAL STANDARD

### I.    Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues

Page 3 - OPINION AND ORDER

exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## II.    Motion to Strike

Federal Civil Procedure Rule 12 provides that the district courts "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" on their own initiative or pursuant to a party's motion. Fed. R. Civ. P. 12(f). The disposition of a motion to strike is within the discretion of the district court. *See Federal Sav. & Loan Ins. Corp. v. Gemini Management*, 921 F.2d 241, 244 (9th Cir. 1990). Motions to strike are disfavored and infrequently granted. *See Stabilisierungsfonds Fur Wein v. Kaiser, Stuhl Wind Distribs. Pty., Ltd.*, 647 F.2d 200, 201, 201 n.1 (D.C. Cir. 1981); *Pease & Curren Refining, Inc. v. Spectrolab, Inc.*, 744 F. Supp. 945, 947 (C.D. Cal. 1990), abrogated on other grounds by *Stanton Road Ass'n v. Lohrey Enters.*, 984 F.2d 1015 (9th Cir. 1993).

## FACTUAL BACKGROUND[1]

### I.    The Simutech/Cadence Agreement

As noted above, plaintiff Morris was the founder and CEO of Simutech Corporation

("Simutech").  In 1999, Simutech introduced an integrated circuit prototyping system it called

"RAVE."  Shortly thereafter, in November 1999, Simutech and Cadence Design Systems, Inc.

("Cadence"), entered into an agreement (the "Simutech/Cadence agreement") pursuant to which

Simutech licensed Cadence to resell RAVE systems manufactured by Simutech for that purpose.

Among the provisions of the Simutech/Cadence agreement were those at issue in the

cross-motions now before the court, namely the provision barring assignments and the provision

purporting to limit the contracting parties' liability to one another.  The first of these, referred to

by the parties as the "no-assignment provision," provides in relevant part as follows:

> Neither this Agreement nor any rights hereunder, in whole or in part, shall be
> assignable or otherwise transferable by either party without the express written
> consent of the other party. . . .

Simutech/Cadence agreement, § 15.4.

The second provision, referred to by the parties variously as the "exculpatory clause" or

the "liability limitation provision," provides in full as follows:

> NEITHER PARTY SHALL BE LIABLE FOR ANY INDIRECT, EXEMPLARY,
> SPECIAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES OF ANY KIND
> (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF IT HAS
> BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, EXCEPT
> FOR EITHER PARTY'S OBLIGATIONS WITH RESPECT TO SECTION 14
> [*sic*] ("CONFIDENTIALITY").  EXCEPT FOR SIMUTECH'S OBLIGATIONS

---

[1] Except where otherwise indicated, the following recitation constitutes the court's
construal of the evidentiary record in light of the legal standard governing motions for summary
judgment under Federal Civil Procedure Rule 56.  This construal is offered in connection with
the motions now before the court only.

Page 5 - OPINION AND ORDER

IN CONNECTION WITH SECTION 12 [*sic*] ("INDEMNITY") AND CADENCE'S OBLIGATIONS TO PAY MONEY DUE, **NEITHER PARTY'S AGGREGATE LIABILITY IN CONNECTION WITH THIS AGREEMENT (WHETHER IN CONTRACT, TORT, OR OTHERWISE) SHALL EXCEED THE AGGREGATE AMOUNTS PAID BY CADENCE TO SIMUTECH UNDER THIS AGREEMENT DURING THE TWELVE (12) MONTHS PRECEDING THE CLAIM.** THIS LIMITATION IS CUMULATIVE, WITH ALL PAYMENTS FOR CLAIMS OR DAMAGES BEING AGGREGATED TO DETERMINE SATISFACTION OF THE LIMIT. THE EXISTENCE OF ONE OR MORE CLAIMS SHALL NOT EXPAND THE LIMIT. THE LIMITATIONS OF LIABILITY CONTAINED IN THIS AGREEMENT ARE A FUNDAMENTAL PART OF THE BASIS OF EACH PARTY'S BARGAIN HEREUNDER, AND NEITHER PARTY WOULD ENTER INTO THIS AGREEMENT ABSENT SUCH LIMITATIONS.

Simutech/Cadence agreement, § 12 (bolded emphasis supplied).[2] The liability-limitation provision appears in all capital letters and large font.

In addition, the Simutech/Cadence agreement contains a provision specifying that its provisions are to be interpreted and construed according to California law:

This Agreement is made under, governed by, and shall be construed in accordance with the laws of the state of California, excluding its choice of laws rule, as applied to contracts between California corporations entered into and to be performed entirely in California.

Simutech/Cadence agreement, § 15.8.

In 2000, Cadence purchased twenty RAVE systems from Simutech, making payment therefor to Simutech in the amount of $4 million. The 2000 payment of $4 million was the only payment Cadence made to Simutech under the Simutech/Cadence agreement. It is undisputed that Cadence failed to resell any of the RAVE systems it purchased from Simutech.

---

[2] The liability-limitation provision references "SECTION 14 ('CONFIDENTIALITY')" and "SECTION 12 ('INDEMNITY'), whereas the section of the Simutech/Cadence agreement bearing the subject heading "CONFIDENTIALITY" is Section 13, and the section bearing the subject-heading "INDEMNITY" is Section 11.

## II.    Dissolution of Simutech and Formation of RaveSim, Inc.

In or around May or June 2001, the contracting parties terminated the Simutech/Cadence

agreement.  At approximately the same time, Simutech began experiencing financial problems,

due – according to Morris – to Cadence's breach of its obligations under the Simutech/Cadence

agreement and to Cadence's misappropriation of Simutech's trade secrets.  Simutech received a

bridge loan from one of its investors, Kirnaf Ltd., but defaulted on its repayment obligations in

the autumn of 2001.  Kirnaf foreclosed, and ultimately purchased all of Simutech's assets at

public auction in September 2001.  On November 13, 2001, Kirnaf contributed the Simutech

assets and $750,000 to form a new company called RaveSim, Inc. ("RaveSim").

## III.    Morris' 2001 Action Against RaveSim and Resulting Settlement Agreement

On November 26, 2001, Morris brought a state-court action against RaveSim

(subsequently adding Kirnaf and Saud ben Khudair as additional defendants), alleging that the

transfer of Simutech's assets to Kirnaf and RaveSim had been fraudulently obtained.  Although

he had other legal representation at the time he initiated the action, beginning in April 2002

Morris was represented by the Grenley Rotenberg defendants.  The parties to Morris' state-court

action went to mediation on November 13, 2002.  According to Morris' testimony, Morris

repeatedly instructed Grenley both prior to and at the mediation to ensure that any agreement to

settle the parties' dispute would provide for perfected assignment of RaveSim's claims against

Cadence to Morris in the event RaveSim declined to pursue them.  The parties reached an

agreement, and a Settlement Agreement and Release (the "Settlement Agreement") was drafted

and signed at the mediation.

The critical term of the Settlement Agreement obliged Morris to dismiss his claims

Page 7 - OPINION AND ORDER

against RaveSim, Kirnaf, and Khudair.  In consideration for Morris' agreement to dismiss his claims, RaveSim agreed "to assess and review whether or not a viable claim exist[ed] against [Cadence]."  RaveSim and Kirnaf further agreed "to review and assess information provided by Morris regarding a claim against Cadence and to render an opinion regarding whether or not a viable claim against Cadence exists based upon the information provided to RaveSim/Kirnaf by Morris."  The Settlement Agreement required Morris to produce all documents in his possession relating to a potential claim against Cadence within 30 days of the effective date of the Settlement Agreement, and gave RaveSim and Kirnaf 60 days thereafter in which to "make a determination on whether it intend[ed] to pursue a claim against Cadence. . . ."

In the event RaveSim and Kirnaf decided to pursue a claim against Cadence, RaveSim and Kirnaf agreed to remit fifteen percent of any recovery (excluding the amount of RaveSim's attorney fees) against Cadence to Morris.  If, however, RaveSim "determine[d] that the information provided by Morris [wa]s insufficient for RaveSim to pursue a claim against Cadence," RaveSim was obliged to provide all such information "to an independent, neutral third-party mutually selected by the Settling Parties and located in Portland, Oregon, to provide an independent assessment of the claim against Cadence."  The Settlement Agreement expressly provided that the "assessment of the claim by such neutral third-party [*sic*] w[ould] be made within 30 days of RaveSim's decision not to pursue a claim against Cadence."

In the event "the independent third party assesse[d] the information provided by Morris and determine[d] that a viable claim exist[ed] against Cadence," and yet RaveSim adhered to its initial decision not to pursue the claim, the Settlement Agreement obliged RaveSim to "assign its right to pursue such . . . claim against Cadence to Morris. . . ."  In the event Morris elected to

Page 8 - OPINION AND ORDER

pursue such assigned claim, Morris agreed to remit fifteen percent of any recovery (excluding the amount of his attorney fees) against Cadence to RaveSim. In addition, Morris agreed to indemnify RaveSim in connection with any such assignment.

## IV.     Morris' Efforts to Obtain Assignment of RaveSim's Claims Against Cadence

Following the settlement of Morris' 2001 action against RaveSim, Kirnaf, and Khudair, Morris provided information in his possession relating to the viability of potential claims against Cadence to RaveSim and Kirnaf, as required under the Settlement Agreement. Approximately seven months later, in July 2003, counsel for RaveSim advised Morris that it had elected not to file any action against Cadence on the basis of the information provided by Morris. RaveSim asked that, in the event Morris desired to bring an action against Cadence, Morris contact RaveSim through his attorney "regarding assignment, indemnity in favor of RaveSim and Kirnaf, and other related issues."

Approximately six months later, in or around January 2004, Morris for the first time responded to RaveSim's advice of July 2003, through counsel (Neil Nathanson, an attorney who is not a party to this action), with a demand that RaveSim assign its claims against Cadence to Morris. RaveSim responded by taking the position that it was not obligated under the Settlement Agreement to assign its potential claims against Cadence, on the grounds that submission of Morris' materials to an independent, neutral third-party evaluator, the evaluator's determination that a viable claim against Cadence existed, and RaveSim's subsequent decision not to pursue such viable claim were mandatory conditions precedent to RaveSim's assignment obligation. Morris argued that, by not unilaterally selecting an independent evaluator and obtaining an independent assessment of the potential claims, RaveSim had waived any such purported

Page 9 - OPINION AND ORDER

conditions precedent, and forwarded a draft assignment of claims to RaveSim for its signature. The proposed draft did not provide for any indemnification of RaveSim in connection with the assignment.

Subsequently, in February 2004, RaveSim's counsel once again advised Morris of its position that, under the Settlement Agreement, Morris was not entitled to transfer of RaveSim's potential claims against Cadence absent an independent assessment of the claims as viable. RaveSim reiterated that it did not intend to file any action against Cadence, and moreover indicated that it would not change its position on that issue regardless of the outcome of the independent evaluation, if any ever took place, but nevertheless expressly advised Morris that it was "not willing to assign worthless claims to Morris." Thus, RaveSim appeared to adhere to the position that, under the Settlement Agreement, RaveSim was not obligated to assign its potential claims against Cadence absent strict compliance with the procedures set forth therein.

Notwithstanding the foregoing, RaveSim did not unambiguously refuse to execute Morris' draft assignment of claims. Instead, RaveSim indicated that it "would cooperate fully . . . to attempt to resolve th[e] matter as quickly as possible" but was nevertheless unwilling to execute the draft assignment agreement as prepared by Morris in the absence of any provision providing for RaveSim's indemnity, as required under the Settlement Agreement.

Morris did not respond to RaveSim's correspondence of February 2004.

## V.   Morris' 2004 Action Against Cadence

On June 17, 2004, Morris sued Cadence in the District of Oregon for breach of contract, breach of the implied covenant of good faith and fair dealing, and misappropriation of trade secrets. Morris was represented in that action by Zusman and the Sussman Shank defendants.

Page 10 - OPINION AND ORDER

According to Morris' declaration, prior to filing against Cadence, Zusman advised him that,

under the Settlement Agreement, RaveSim's decision not to sue Cadence resulted in automatic

assignment to Morris of RaveSim's potential claims against Cadence.  Morris brought his action

against Cadence in his own name, and without first consulting with or notifying RaveSim.

    In November 2004, Judge Aiken found that there were grounds for dismissing Morris'

claims against Cadence for lack of standing, but nevertheless gave Morris leave to amend his

pleading to more adequately allege grounds in support of his standing to sue.  Morris amended

his pleading accordingly, and Judge Aiken found that Morris' amended allegations of standing

were sufficient to permit his claims to survive a motion to dismiss under Federal Civil Procedure

Rule 12(b)(6).  Judge Aiken stayed discovery on the merits of Morris' claims, and permitted the

parties to conduct discovery only in connection with the standing issue.  After the parties

completed discovery in connection with Morris' standing, in approximately March 2006,

Cadence moved for summary judgment on the grounds that Morris lacked standing to bring

action against it.

    On June 6, 2006, Judge Aiken granted summary judgment in Cadence's favor on the

standing issue, dismissing Morris' action.  Judge Aiken specifically found that, under the

Settlement Agreement:

> RaveSim would be obligated to assign a claim to plaintiff against Cadence if the
> following events took place: (1) plaintiff provided information on the claims he
> believed existed against Cadence to RaveSim; (2) RaveSim determined that it
> would not pursue a claim against Cadence; (3) the parties obtained an independent
> assessment from a neutral third party determining that a valid claim existed; and
> (4) RaveSim nevertheless, declined to bring suit against Cadence.

*Morris v. Cadence Design Sys.*, Case No. 04-877-AA, 2006 U.S. Dist. LEXIS 37031, *10 (D. Or.

June 6, 2006). Characterizing the four enumerated conditions as conditions precedent to RaveSim's assignment obligation, Judge Aiken specifically found that the parties had offered no evidence to show that the third and fourth conditions precedent – that the parties obtain the opinion of an independent, neutral third party that the potential claim or claims against Cadence were "viable" and that RaveSim nevertheless decline to pursue the claim in its own behalf – had ever been satisfied. *See id.* at *11. Judge Aiken further found that RaveSim had never purported to assign to Morris its claim or claims, if any, against Cadence. *See id.* Moreover, Judge Aiken found that the evidence established that RaveSim had not otherwise assigned its claims against Cadence to Morris. *See id.*; *see also id.* at 16-17.

Judge Aiken additionally found that in August 2004 – two months after Morris filed his action against Cadence (and apparently in correspondence that has not been offered into evidence in this action) – Morris' counsel (apparently either Zusman or one of the Sussman Shank defendants) wrote to RaveSim's counsel to advise RaveSim of Morris' action against Cadence and to reiterate Morris' request for assignment of RaveSim's claims against Cadence. *See id.* at 14. According to Judge Aiken's findings, RaveSim responded by reiterating its position that "prior to [RaveSim] executing any assignment of claims, the terms of the Settlement Agreement required that Morris execute indemnity and security agreements in favor of RaveSim and Kirnaf" and that absent such indemnity, it remained unwilling to effect the assignment. *See id.* at 14-15.

Judge Aiken also opined that had any such assignment been effected, it would have been unenforceable in light of the no-assignment provision of the Simutech-Cadence agreement. However, in light of her finding that no assignment had been made, and of her holding that therefore Morris lacked standing to sue Cadence, Judge Aiken lacked jurisdiction to consider the

merits of Morris' claims against Cadence. Her opinion regarding the enforceability and

applicability of the no-assignment provision was therefore necessarily made in *dicta*.

## VI.   Morris' 2007 Action Against RaveSim

In February 2007, through his counsel defendant Brecht, Morris requested that RaveSim

obtain an independent, neutral third party's assessment of RaveSim's potential claims against

Cadence. RaveSim declined to do so, asserting that Morris' request was untimely under the terms

of the Settlement Agreement.

On August 15, 2007, Morris (represented by the Sussman Shank defendants and by his

current counsel Christopher LaVoy) brought an action in this court against RaveSim, seeking

declaratory judgment that RaveSim, by its conduct, had effected assignment of its potential

claims against Cadence to Morris, and alternatively seeking specific performance of RaveSim's

purported contractual obligation under the Settlement Agreement to effect assignment to Morris

of its claims against Cadence. In March 2008, I recommended that the court deny cross-motions

for summary judgment in Morris' 2007 action, on the grounds that the Settlement Agreement was

ambiguous as a matter of law. Judge Mosman adopted my recommendations as his own opinion

on June 25, 2008. On July 2, 2008, Morris moved to terminate his representation by the

Sussman Shank defendants and to substitute for them his current counsel, Judy Snyder. I granted

Morris' motion for substitution of counsel on July 7, 2008.

Morris and RaveSim settled their dispute in January 2009. According to the terms of the

parties' settlement, RaveSim agreed to assign its claims against Cadence to Morris in exchange

for Morris' covenant not to sue Cadence on the assigned claims, his agreement to indemnify

RaveSim for some of its incurred costs, and his waiver of all claims against RaveSim.

## VI.    Current Action

On June 4, 2009, Morris brought this action against the Evans & Zusman defendants (who represented Morris for purposes of his 2004 action against Cadence, but apparently not for any other purpose), the Sussman & Shank defendants (who represented Morris for purposes of his 2004 action against Cadence and 2007 action against RaveSim) and the Grenley Rotenberg defendants (who represented Morris for purposes of his 2001 action against RaveSim and Kirnaf and the Settlement Agreement of November 13, 2002, by which that action was settled), alleging all defendants' negligence in the course of representing him in the fore-described legal actions.

As to the Evans & Zusman defendants and the Sussman Shank defendants, Morris specifically alleged that these defendants breached their duty of care to him in connection with his 2004 action against Cadence by (i) failing to recognize that the assignment provisions of the Settlement Agreement created only a conditional promise to assign rather than a perfected assignment, (ii) failing to join RaveSim as a party to the 2004 action against Cadence, (iii) failing to advise Morris of his need to satisfy conditions precedent before obtaining assignment of RaveSim's claims against Cadence, and (iv) failing to recognize or argue in the 2004 action against Cadence that the "no-assignment" provision of the Simutech/Cadence agreement was unenforceable as a matter of applicable California law.  Morris alleged Zusman's, Cook's, and Brecht's direct liability for such negligence and Evans & Zusman's and Sussman Shank's vicarious liability therefor on a theory of *respondeat superior*.

As to the Grenley Rotenberg defendants, Morris specifically alleged that these defendants breached their duty of care to him by negotiating and/or drafting the November 2002 Settlement Agreement in such a way that (i) it failed to ensure that RaveSim's decision not to bring action

Page 14 - OPINION AND ORDER

against Cadence would automatically effect the assignment of RaveSim's claims against Cadence to Morris, and (ii) RaveSim's assignment obligation was conditioned in part on an independent evaluator making the determination that "a viable claim exists against Cadence." Morris alleged Grenley's direct liability for such negligence and Grenley Rotenberg's vicarious liability therefor on a theory of *respondeat superior*.

On July 26, 2011, based on the parties' stipulations, Morris' claims against Evans & Zusman were dismissed. Two days later, on July 28, 2011, I granted summary judgment in favor of Zusman and the Sussman Shank defendants as to Morris' claim against those defendants to the extent premised on the allegation that defendants Zusman, Cook and Brecht were negligent in failing to recognize or argue in the 2004 action against Cadence that the no-assignment provision of the Simutech/Cadence agreement was unenforceable as a matter of applicable California law, and as to Morris' prayer for damages in the amount of the recovery he would have obtained against Cadence had he prevailed in his 2004 action against it to the extent premised on the allegation that Zusman, Cook and Brecht were negligent in failing to recognize that the assignment provisions of the Settlement Agreement created only a conditional promise to assign rather than a perfected assignment and in failing to advise Morris of his need to satisfy conditions precedent before obtaining assignment of RaveSim's claims against Cadence.

## ANALYSIS

### I.    Governing Law

Where, as here, a federal district court's subject-matter jurisdiction is based on the diversity of the parties and the amount in controversy, the district court will apply federal procedural law and the substantive law of the state in which the court is located, in this case that

Page 15 - OPINION AND ORDER

of Oregon. *See Zamani v. Carnes*, 491 F.3d 990, 995 (9th Cir. 2007); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Oregon law therefore governs Morris' malpractice claims against the defendants.

Notwithstanding the foregoing, as noted above the Simutech/Cadence agreement contained a provision specifying that its terms were to be "construed in accordance with the laws of the state of California. . . ." Simutech/Cadence agreement, § 15.8. The Oregon courts routinely enforce such choice-of-law provisions, except where it would be unreasonable to do so because the chosen state has no substantial relationship to the parties or application of the chosen state's law would be contrary to fundamental Oregon policy. *See, e.g., Capital One Bank v. Fort*, 242 Or. App. 166, 170-171 (2011). Because neither exception to Oregon's general rule of enforcing contractual choice-of-law provisions is applicable here, the provisions of the Simutech/Cadence agreement will be interpreted according to California law.

## II.     Morris' Motion for Partial Summary Judgment

By and through his motion, Morris seeks this court's judgment that RaveSim's assignment to him of its claims, if any, against Cadence is enforceable notwithstanding the no-assignment provision of the Simutech/Cadence agreement. Defendants do not oppose Morris' motion, and, indeed, advised the court at oral argument that they do not intend to rely on the no-assignment provision at any stage of these proceedings in support of any argument that the assignment to Morris of RaveSim's claims against Cadence, if any, was invalid or unenforceable.

Nevertheless, although Morris is clearly correct that RaveSim's assignment to Morris of its right to sue Cadence would be enforceable even if the Simutech/Cadence agreement purported to bar such assignments – *see* Cal. Com. Code § 2210(2) ("[a] right to damages for breach of the

whole contract or a right arising out of the assignor's due performance of his or her entire

obligation can be assigned despite agreement otherwise"), *Balfour, Guthrie & Co. v. Hansen*, 227

Cal. App. 2d 173, 187 (1964) (a contractual "prohibition against assignment does not prevent

assignment of a cause of action under the contract"), *see also* Cal. Civ. C . § 954 (in general, the

right to bring a legal action is assignable under California law) – which it does not (the "no-

assignment" provision of the Simutech/Cadence agreement appears to prohibit assignments of

rights or obligations provided under the agreement only, and does not address the assignability of

the right to bring an action in the event of breach of the agreement), I note that no party to this

action has filed any claim for declaratory relief as to the enforceability of either the assignment or

the no-assignment provision, and that the no-assignment provision has not been raised as an

affirmative defense by any party to this action. As such, the question of the enforceability of the

assignment is not a matter as to which this court can properly enter judgment.[3] Because the court

lacks authority to enter judgment as to the legal proposition that the assignment to Morris of

RaveSim's right to sue Cadence is enforceable under applicable California law, Morris' motion

for partial summary judgment is denied. Such disposition shall be without prejudice to Morris'

right to file an appropriate motion *in limine* at a later stage of these proceedings addressing the

same or related legal issues.

---

[3] At oral argument, I raised my concerns regarding the court's authority to enter judgment
in Morris' favor in connection with this proposition, and counsel for Morris advised that if he
were able to locate case law indicating that the court had authority to enter the requested
judgment, he would provide the court with citations to such authority. Counsel has not provided
the court with any such citations.

Page 17 - OPINION AND ORDER

III.    **Zusman's Oral Motion to Strike a Portion of Morris' Sur-Reply in Opposition to Defendants' Motion for Partial Summary Judgment**

At oral argument in connection with the dispositive motions now before the court, counsel for Zusman made an oral motion to strike the third and final section of the sur-reply Morris filed January 3, 2012, in support of his opposition to defendants' partial summary judgment motion.  Counsel argued that, under Local Rule 56-1(b), a sur-reply such as that filed by Morris is authorized only to the extent it raises evidentiary objections in connection with the opposing party's reply memorandum, or responds to evidentiary objections raised by the opposing party in its reply.  Counsel characterizes the third section of Morris' sur-reply as containing substantive legal argument rather than evidentiary objection.

The oral motion to strike is denied.  Any substantive legal argument contained in Morris' sur-reply of January 3, 2012, will be disregarded.

IV.    **Morris' Request for Certification to the California Supreme Court**

As noted above, at oral argument counsel for Morris requested certification of legal issues raised by defendants' motion for partial summary judgment to the California Supreme Court. Pursuant to California Court Rule 8.548, however, the California Supreme Court accepts certification of legal issues only from "the United States Supreme Court, a United States Court of Appeals, or the court of last resort of any state, territory, or commonwealth," and not from federal district courts.  Cal. R. Court 8.548.  Morris' request for certification is therefore denied as moot.

V.    **Defendants' Motion for Partial Summary Judgment**

By and through their motion, defendants seek partial summary judgment as to Morris' damages claims, to the extent those claims are premised on defendants' negligent failure to

recover damages against Cadence. Specifically, defendants acknowledge that Morris may seek damages against the Evans & Zusman defendants and Sussman Shank defendants in the form of unnecessarily incurred attorney fees, but to the extent that Morris additionally seeks damages in the amount of the recovery that (but for defendants' negligence) he would have obtained in an action against Cadence, defendants argue that even absent their alleged negligence the damages available from Cadence would have been capped at zero, and that, in consequence, the damages Morris may recover from defendants in this malpractice action (to the extent premised on defendants' alleged negligence in obtaining assignment of the right to sue Cadence) are subject to the same cap. As noted above, the Simutech/Cadence agreement contained a provision pursuant to which each party's aggregate liability to the other in connection with the agreement, whether in contract, tort, or otherwise, would not exceed the aggregate amounts paid by Cadence to Simutech under the agreement during the twelve months preceding the claim. *See* Simutech/Cadence agreement, § 12. Defendants take the position that the Simutech/Cadence agreement's liability-limitation provision would have been enforceable against Simutech (and therefore RaveSim as Simutech's successor in interest and Morris as RaveSim's assignee) had it brought the claims it assigned to Morris against Cadence. Defendants take the further position that, as of the earliest date Simutech's purported claims for breach of contract and/or misappropriation of trade secrets could have accrued, Cadence had paid nothing to Simutech during the preceding twelve months, so that the effect of the provision would be to cap the damages available in connection with any such claims against Cadence at zero. Morris, for his part, does not dispute that Cadence had paid nothing to Simutech during the twelve months preceding the earliest date the claims against Cadence might have accrued, but argues that the

Page 19 - OPINION AND ORDER

liability-limitations provision is effectively an exculpatory provision, and as such is

unenforceable under applicable California law.

Since 1872 – and without amendment since that time – California statutory law has

provided that the parties to a contract may not contract away liability for future intentional

misconduct or for future violation of statutory law, whether or not intentional:

> All contracts which have for their object, directly or indirectly, to exempt anyone
> from responsibility for his own fraud, or willful injury to the person or property of
> another, or violation of law, whether willful or negligent, are against the policy of
> the law.

Cal Civ. C. § 1668. In 1963, the California Supreme Court analyzed nearly a century of

jurisprudence construing Section 1668, and held that, in addition to provisions purporting to

eliminate liability for intentional injurious acts or for statutory violations, under Section 1668,

provisions purporting to eliminate liability for ordinary negligence are also invalid where such

provisions tend foreseeably to impair the public interest (as where the party seeking exculpation

for future conduct is performing a service of great public importance and in consequence is in a

position to present the public with an exculpatory adhesion contract). *See Tunkl v. Regents of*

*University of Cal.*, 60 Cal. 2d 92, 96-101 (1963). The *Tunkl* court reasoned that, "[w]hile

obviously no public policy opposes private, voluntary transactions in which one party, for a

consideration, agrees to shoulder a risk which the law would otherwise have placed upon the

other party," it is appropriate to apply Section 1668 to invalidate exculpatory provisions that

purport to shift the risk of liability for a service-provider's negligence to parties lacking either a

meaningful choice to forego the offered service or the bargaining power to refuse the risk. *See*

*id.* at 101. The California Supreme Court recently reaffirmed and expanded the *Tunkl* analysis,

holding that under Section 1668 contractual provisions that purport to exculpate "gross" or "aggravated" negligence are likewise invalid. *See City of Santa Barbara v. Superior Court*, 41 Cal. 4th 747, 777 (2007) ("public policy generally precludes enforcement of an agreement that would remove an obligation to adhere to even a *minimal* standard of care").

In 2003, the California Court of Appeals clarified that Section 1668 did not invalidate all provisions purporting to exculpate a party's violations of law, but rather only those purporting to exculpate a party's violation of statutory law (including violation of regulatory provisions that implement statutory law). *See Health Net of California, Inc. v. Department of Health Services*, 113 Cal. App. 4th 224, 233-234 (2003).

There appears to be a degree of ambiguity in the case law construing Section 1668 as to whether the statute operates to void contractual provisions which do not entirely exculpate statutory violations or intentional injurious or fraudulent conduct, but purport instead merely to limit the money damages available to an aggrieved party arising out of such violations or conduct. In 1966, in *Klein v. Asgrow Seed Co.*, 246 Cal. App. 2d 87 (1966), the California Court of Appeals considered a liability-limitation disclaimer contained in a warranty provided by a seller of agricultural seeds to a seed buyer in connection with a sale of seeds. The disclaimer purported to limit the seller's liability to the buyer to the purchase price paid by the buyer for the seeds. The court found that, under the circumstances presented, the disclaimer was insufficient to constitute or create an express agreement between the seller and the buyer as to limitation of the seller's potential liability to the buyer, in part because the seller had knowingly sold unsuitable, mislabeled seeds to the buyer. *See Klein*, 246 Cal. App. 2d at 98-100. In consequence, the court concluded that no grounds existed for limiting the money damages

available to the buyer in connection with its cause of action for breach of the seller's express warranty. *See id.* at 99-100. Therefore necessarily in *dicta*, the *Klein* court further opined that had the parties entered into an agreement to limit the money damages available to the buyer in a cause of action against the seller -- which they did not -- such agreement would have been void and unenforceable pursuant to Section 1668. *See id.* at 100-101. The *Klein* court did not explain its reasoning; in particular, the *Klein* court did not clarify whether, in its view, Section 1668 would have applied to any contractual agreement to limit money damages available in connection with statutory violations or intentional injurious or fraudulent conduct, or whether other factors governed the analysis, including the facts that the agreement, if one had existed, would have constituted a contract of adhesion, or that the putative limitation would have capped available damages at an effectively nominal level, with no rational relationship to the damages an aggrieved buyer would be expected to suffer.

In 1974, the Fifth Circuit had occasion to determine whether the California courts would apply Section 1668 to a negotiated agreement for the purchase of aircraft between Delata Air Lines and the McDonnell Douglas Corporation which purported to set specified caps on the money damages available to the buyer in the event of the seller's negligence. Following analysis of Section 1668 and of California case law construing it, the Fifth Circuit expressly declined to invalidate the parties' agreement, stating "[w]e are unable to agree that the contract between two industrial giants fixing the dollar responsibility for [the seller]'s alleged negligence would be void under California law, any more than would be an insurance contract which might be written for the same purpose." *Delta Air Lines, Inc. v. McDonnell Douglas Corp.*, 503 F.2d 239, 244 (5th Cir. 1974) (applying California law).

Page 22 - OPINION AND ORDER

In 1997, in *Farnham v. Superior Court*, 60 Cal. App. 4th 69 (1997), the California Court of Appeals expressly stated, *pace Klein*, that "[a]lthough exemptions from *all* liability for intentional wrongs, gross negligence and violations of the law have been consistently invalidated . . . , we have not found any case addressing a *limitation* on liability for intentional wrongs, gross negligence or violations of the law." *Farnham*, 60 Cal. App. 4th at 74 (emphasis original, citations omitted).[4] Indeed, the *Farnham* court cited with approval *Wheeler v. Oppenheimer*, 140 Cal. App. 2d 497, 500 (1956), which establishes that the California courts will enforce contractual limitations on the amount of money damages available to a party for breach of contract under at least some circumstances.[5] The *Farnham* court further noted that:

> Section 1668 is not strictly applied. Despite its prohibition of an exemption from liability for future acts of "negligence," section 1668 does not *per se* prohibit a contractual release of future liability for ordinary negligence unless the "public interest" is involved or unless a statute expressly forbids it. . . . **Despite its purported application to "[a]ll contracts," section 1668 does not bar either contractual indemnity or insurance, notwithstanding that (aside from semantics) the practical effect of both is an "exempt[ion]" from liability for negligence.**

---

[4] The *Farnham* court in fact cited *Klein* as illustrative of the proposition that complete exculpation from all liability falls afoul of Section 1668, apparently failing to note that the unilateral *Klein* disclaimer purported to limit money damages available to an aggrieved buyer rather than absolutely to eliminate the seller's liability. *See id.* Nevertheless, because the *Klein* court's discussion of Section 1668 was patently unnecessary to support its holding and therefore not precedential, *see, e.g., People v. Vang*, 52 Cal. 4th 1038, 1047, n. 3 (2011), the *Farnham* court cannot fairly be said to have erred in suggesting that no California case had found a limitation on money damages to contravene Section 1668.

[5] The *Wheeler* opinion did not address Section 1668, but rather Cal. Civ. C. § 1670, which renders liquidated damages provisions unenforceable except to the extent that "it would be impracticable or extremely difficult to fix the actual damage" as provided in Cal. Civ. C. § 1671. Nevertheless, the court expressly held that the "validity" of a contractual "limitation on the maximum possible recovery for actual loss or damage alleged and shown by evidence" was "not open to doubt," citing in support numerous California cases in which "[s]imilar contractual limitations of liability" were upheld. *Wheeler*, 140 Cal. App. 2d at 499, 500.

*Id.* (modifications original, bolded emphasis supplied).  On the basis of the foregoing, the *Farnham* court concluded that, at least in a context in which no public interest is implicated, a mere contractual limitation as opposed to elimination of liability is not *per se* invalid under Section 1668.  *See id.* at 75, 77, 77 n. 6, 78, 78 n. 8.

The California Court of Appeals' 2003 *Health Net* decision, in addition to clarifying the scope of Section 1668 as to violations of statutory law as discussed above, also characterized the *Klein dicta* as "appl[ying] section 1668 to void a limitation-of-liability provision." *Health Net*, 113 Cal. App. 4th at 240.  In part on the basis of its reading of *Klein*, the *Health Net* court opined that:

> while some contractual limitations over the scope of available remedies need not necessarily run afoul of section 1668—an issue we need not decide here—there is assuredly a point at which a limitation on the scope of remedies reaches the point of constituting an "exempt[ion] … from responsibility for [the] … violation of law," in the words of the statute.  In a commercial case, an exculpation of *any* liability for *any* damages for *any* statutory violation surely rises to the level of an "exempt[ion] from responsibility" within the meaning of the plain language of section 1668.

*Id.* at 239 (emphasis original).  That is, the *Health Net* court found that a limitation of liability that capped the availability of money damages at zero was unenforceable under Section 1668, but expressly declined to rule as to whether such limitations that operated as less than complete exemptions from responsibility could fall within the scope of the statute.  The *Health Net* court acknowledged previous California opinions in which such limitations were deemed enforceable, including *Farnham*, discussed above, and the cases cited therein, and *Pink DOT, Inc. v. Teleport Communications Group*, 89 Cal. App. 4th 407, 413-414 (2001) (finding contractual provision providing for complete elimination of liability for willful misconduct or for violation of law to be

unenforceable under Section 1668, but tacitly finding a $10,000 cap on damages available for redress of gross negligence to be outside the scope of the statute), as well as *Delta*, also discussed above.

Under *Santa Barbara* and *Health Net*, then, any limitation of liability that, while facially falling short of an absolute elimination of liability, would nevertheless be unenforceable under Section 1668 to the extent that it so limited the money damages available as to constitute a *de facto* exemption from responsibility for intentional misconduct or violation of statutory law, obviating the need to adhere to even a minimal standard of care. However, in keeping with *Tunkl*'s teaching that in the context of agreements negotiated at arm's length among parties of approximately equal bargaining power that do not implicate the public interest, California's public policy as codified at Section 1668 is not offended by "private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party," *Tunkl*, 60 Cal. 2d at 101, I am persuaded that, as suggested by the court in *Farnham*, negotiated agreements to cap available money damages at reasonable levels would not be within the scope of the statute.

Here, the Simutech/Cadence agreement was a contract negotiated at arm's length between two parties of approximately equal bargaining power. The Simutech/Cadence agreement is in no way a contract for provision of services that directly implicate the public interest, but rather was a contract primarily for the purpose of licensing Cadence to resell goods manufactured by RaveSim. The liability-limitation provision appears in the agreement in all capital letters and in large font. As noted above, the liability-limitation provision expressly provided that the subject limitations on liability formed a fundamental part of the basis of each party's bargain with the

Page 25 - OPINION AND ORDER

other, and that neither party would have been willing to enter into the agreement absent the limitations. As such, the liability-limitation provision would fall afoul of Section 1668 only to the extent its contemplated limitation on the availability of money damages can properly be characterized as constituting a *de facto* exemption from responsibility for intentional misconduct or violation of statutory law, obviating the need to adhere to even a minimal standard of care.

Morris urges the court to construe the Simutech/Cadence agreement's liability-limitation provision as a purely exculpatory provision, noting, correctly, that, as applied to RaveSim's potential claims against Cadence under the circumstances of the parties' dealings with one another after entering into the agreement, the effect of the liability limitation provision if it were enforced would be to eliminate the availability of money damages in connection with RaveSim's potential claims against Cadence altogether. I am aware, however, of no authority suggesting that the enforceability of the liability-limitation provision could properly be measured other than as of the time the parties negotiated its terms, and Morris cites to none. At the time the parties negotiated the terms of the provision, the intended and foreseeable effect of the provision was to cap either party's liability to the other in connection with the agreement at the dollar value of the parties' commercial dealings under the agreement during the twelve months preceding the accrual of a claim in connection with the agreement. As of the time the parties entered into their agreement, such a damages cap was a reasonable means of controlling the magnitude of the risk the parties faced in entering into their business arrangement, and would not have obviated either party's obligation to adhere to minimal standards of care.[6] I therefore conclude that the liability-

---

[6] As noted above, in 2000 Cadence paid Simutech $4 million under the Simutech/Cadence agreement.

Page 26 - OPINION AND ORDER

limitation provision of the Simutech/Cadence agreement is outside the scope of Section 1668, and therefore enforceable under applicable California law. As it was for the Fifth Circuit in *Delta*, it is unthinkable to me that the California courts would apply Section 1668 to invalidate a provision negotiated at arm's length between two parties of approximately equal bargaining power, capping the damages either party might seek against the other in connection with their agreement not at nominal or even arbitrary levels but rather at the dollar value of the parties' business dealings over the full year preceding accrual of a claim in connection with the agreement. *See Delta*, 503 F.2d at 244.

Because I conclude that the liability-limitation provision is enforceable as applied to Simutech's potential claims against Cadence, it follows that RaveSim's succession to Simutech's rights, if any, vis-à-vis Cadence and RaveSim's subsequent assignment of its claims against Cadence to Morris are likewise subject to and constrained by the liability-limitation provision. As noted above, the parties are in agreement that the effect of the liability-limitation provision if it were enforced would be to cap the money damages available in connection with the assigned claims at zero, and my analysis of the evidence provides no reason to doubt the parties' conclusion. Because, pursuant to the liability-limitation provision, Morris could not have obtained money damages in any action against Cadence, had he brought such an action on the assigned claims after they had validly been assigned to him, it follows that Morris may not recover money damages from the defendants on the theory that, but for defendants' negligence, he would have recovered such damages from Cadence.[7] *See, e.g., Varner v. Eves*, 164 Or. App.

---

[7] As noted above, such disposition does not impact Morris' entitlement to seek money damages from the defendants in the amount of unnecessarily incurred attorney fees.

—

66, 73 (1999), *citing Chocktoot v. Smith*, 280 Or. 567, 570 (1977); *Harding v. Bell*, 265 Or. 202, 205 (1973).

For the foregoing reasons, defendants' motion for partial summary judgment is granted.

## CONCLUSION

For the reasons set forth above, Morris' motion (#102) for partial summary judgment is denied without prejudice to Morris' entitlement to bring any motion raising the same or related legal issues at a later stage of these proceedings, as discussed above, Zusman's informal, oral motion to strike is denied, Morris' request for certification to California Supreme Court is denied as moot, and defendants' motion (#103) for partial summary judgment is granted.

Dated this 9th day of March, 2012.

Honorable Paul Papak
United States Magistrate Judge